IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TAMERA LYNN KOPIS, | ) | Case No. 1:22-CV-2212 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Tamera Lynn Kopis, seeks judicial review of the final decision of the

Commissioner of Social Security, denying her applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act.  Kopis challenges the Administrative Law Judge's ("ALJ") negative findings, contending

that the ALJ erred in evaluating her subjective symptom complaints.  Because the ALJ applied

proper legal standards and reached a decision supported by substantial evidence, I recommend

that the Commissioner's final decision denying Kopis's applications for DIB and SSI be

affirmed.

**I.      Procedural History**

On May 26, 2020, Kopis applied for DIB, and on June 3, 2020, she applied for SSI.

(Tr. 899-908).  Kopis alleged that she became disabled on March 1, 2020, due to:

(i) back problems; (ii) anxiety; (iii) hypothyroidism; (iv) hip problems; and (v) high cholesterol.

(Tr. 950, 974).  The Social Security Administration denied Kopis's applications initially and

upon reconsideration.  (Tr. 769-776, 787-794).  Kopis requested an administrative hearing.

(Tr. 824-827).

ALJ Traci Hixson telephonically heard Kopis's applications in an October 19, 2021

hearing and denied her applications in a December 10, 2021 decision.  (Tr. 709-726).  In doing

so, the ALJ found that Kopis was limited to sedentary work, except that:

> [Kopis can] occasionally climb ramps and stairs, no ladders, ropes, or scaffolds; frequently balance, occasionally stoop, kneel, crouch, crawl; no exposure to hazardous machinery or unprotected heights, no commercial driving.

(Tr. 716).  The Appeals Council declined further review, rendering the ALJ's decision the final

decision of the Commissioner.  (Tr. 1-3).  Kopis filed a complaint seeking judicial review.  ECF

Doc. 1.[1]

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Kopis was born on March 29, 1960 and was 59 years old on the alleged onset date.

(Tr. 938).  She had completed high school, obtained a commercial driver's license, and had

previously worked as a customer service representative and as a food service worker.  (Tr. 951).

### B.    Relevant Medical Evidence

Because the ALJ discussed evidence pre-dating Kopis's alleged onset date to provide

context for Kopis's medical conditions, my summary of the evidence also includes evidence pre-

dating the alleged onset date for context purposes.

On January 7, 2019, Kopis underwent bone density testing, which indicated she had an

increased risk of fracture in her neck.  (Tr. 1472).

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

On January 16, 2019, Kopis underwent imaging of her hips and pelvis that showed mild to moderate osteoarthritic changes in both hips, with greater changes in her left. (Tr. 1465-1466).

On February 6, 2019, Kopis had MRI imaging of her spine and hips.  (Tr. 1458-1463). As to her hips, she was found to have moderate osteoarthritic changes in both hips at the "superior joint space," no sign of acute osseous abnormality, mild degenerative changes of the lower lumbar spine and sacroiliac joints, and incidental distal colonic diverticulosis. (Tr. 1459-1460).  As to her spine, imaging indicated that Kopis had mild multilevel discogenic degenerative changes of her lumbar spine, with mild bulging between several lumbar discs with hypertrophic facet arthrosis and mild to moderate central canal narrowing at those levels, a "suspect" atypical hemangioma at one disc on the left, and a subtle edema within one disc's pedicles without fracture.  (Tr. 1463).  "[M]ost significant[ly]," the MRI indicated that one of her discs had moderate bulging and central/right paracentral disc protrusion as well as facet arthrosis, which it noted contributed to moderate to severe central canal narrowing and severe crowing of the intrathecal nerve roots.  *Id.*

At an unspecified time in March 2019, Kopis underwent a spinal laminectomy with Robert Berkowitz, M.D.  (*See* Tr. 1217).

On March 7, 2019, Kopis underwent imaging of her chest, which revealed mild atelectasis in the bases of her lungs but was otherwise unremarkable.  (Tr. 1434-1435).

On March 29, 2019, Kopis underwent a venous duplex scan of her lower extremities that showed no evidence of deep vein thrombosis in her right lower leg.  (Tr. 1431-1432).

On April 2, 2019, Kopis saw Dr. Berkowitz for post operative visit regarding her laminectomy and reported that she had 80% improvement in her back pain and 20%

improvement in her right leg.  (Tr. 1092).  On examination, Dr. Berkowitz noted that Kopis's

back was a little tender, she had "pretty good" range of motion, good strength, no instability, and

her upper extremities were unremarkable.  (Tr. 1092-1093).

On July 24, 2019, Kopis saw chiropractor Jack Coates, Jr., D.C.  (Tr. 1026).  A review of

her systems indicated she had sinus problems and smoked a half pack of cigarettes a day, having

done so for 35 years.  *Id.*  Kopis reported that she had pain that would wake her up during the

night, she coughed a lot, and she had pain in her legs, hips, and back, specifically she was

concerned with the pain in her lower center back.  (Tr. 1027).  On examination, Dr. Coates noted

that Kopis had grade 3 pain across her thoracolumbar spine.  (Tr. 1029).  He instructed her to ice

her back.  (Tr. 1031).

On July 25, July 30, and August 2, 2019, Kopis saw Dr. Coates, who noted she continued

to improve.  *Id.*  Dr. Coates consistently reported that Kopis's point tenderness was diminishing

and encouraged her to do at-home exercises.  (Tr. 1033)*.*

On January 6, 2020, Kopis saw Kala Ravichandran, M.D., complaining of memory

issues.  (Tr. 1170, 1173).  Kopis reported that beginning three weeks earlier, she'd experienced

increased fatigue, sharp pains, and headaches, and that twice while driving she had ended up at

locations different from where she had been trying to go and could not remember  how she'd

gotten to where she was.  (Tr. 1170).  A review of her systems was consistent with her

complaints, and her physical examination was unremarkable.  (Tr. 1170-1171).

Dr. Ravichandran ordered bloodwork and a brain CT, which when subsequently performed was

unremarkable (*see* Tr. 1166-1167).  (Tr. 1171).

On March 11, 2020, Kopis saw Jason Dearth, PA-C, regarding her lower back and right

leg radicular pain.  (Tr. 1130).  Kopis reported that in the previous 5 or 6 weeks, the pain that had

been relieved by her laminectomy had returned.  *Id.*  She indicated that the pain would start in her right lower back, in the sacroiliac ("SI") region, and then radiated down her right leg, occasionally reaching her foot.  *Id.*  She reported occasional mild discomfort in her left leg and noted that 20% of her pain was from her back, while 80% was from her leg.  *Id.*  She thought carrying her infant grandson might be aggravating her pain and reported that chiropractic therapy had not helped.  *Id.*

On physical examination, Dearth observed that Kopis was tender in the right paraspinal musculature in her lumbar region and down into the right SI region; had limited range of motion with flexion, extension, rotation, and lateral bending secondary to her pain; and, on examination, her lower extremities and joints were normal.  (Tr. 1131).  He also noted Kopis's gross sensation was intact bilaterally in her legs.  *Id.*  Kopis also had x-rays taken of her spine, which indicated she had mild degenerative changes with minimal subchondral sclerosis and anterior marginal osteophyte formation.  (Tr. 1131, *see also* Tr. 1140)*.*  Dearth ordered an MRI and EMG and instructed Kopis to get physical therapy.  (Tr. 1133).

On March 25, 2020, Kopis underwent a spinal MRI, which indicated that she had interval postoperative changes from her laminectomy, a new tiny annular fissure within a right paracentral disc protrusion, and multilevel degenerative changes of her lumbar spine.  (Tr. 1135).

On April 3, 2020, Kopis saw Dr. Berkowitz about her lower back pain.  (Tr. 1217).  She reported developing right leg pain about a year after her laminectomy and described the pain as on the right anterior thigh, stopping at her knee, and occasionally going down the front of her leg.  *Id.*  Kopis was unsure if the pain was from her back or hip and believed it was aggravated by carrying her grandson.  *Id.*  Dr. Berkowitz thought she may have some congenital stenosis in her spine; he instructed her to have physical therapy and prescribed a Medrol Dosepak.  *Id.*

On April 8, 2020, Kopis saw physical therapist Julie Renner, PT, for lower back pain and radiculopathy in her spine's lumbar region.  (Tr. 1041).  Kopis reported that she had experienced lower back pain for years and had had surgery for it in March 2019 with initial relief.  *Id.*  But she stated the pain in her right leg had come back, with greater intensity.  *Id.*  She could not identify whether the pain was from her back or hip but indicated that her leg would give out when she walked and described her pain as numbness/tingling down to her knees, occasionally down to her calf, and occasionally in her hands.  *Id.*  Kopis rated her pain as 8/10, noting that at its worst, it was 10/10.  *Id.*  She also reported that chiropractic care helped.  *Id.*

On a review of her daily living activities, Kopis reported that she could not sleep on her right side due to the pain; she had pain when walking any distance, carrying her grandchild upstairs, twisting, and turning; and she was unable to sit/stand for more than 20 minutes or use the vacuum.  *Id.*  She also indicated she had difficulty putting on or removing her pants, getting into a car, and had sharp pain when bending forward.  (Tr. 1042).  Renner performed muscle testing on Kopis's lower extremities, which indicated that she had nearly normal functioning on her left side, except for her hip internal rotation that was -5/5, and she had limitations across her hip rotation and knee extension and flexion on her right side.  *Id.*  Renner also observed that Kopis had a Trendelenburg gait[2] pattern.  *Id.*  Following instruction on various exercises, Renner determined that Kopis required skilled physical therapy to address her restrictions and noted that her overall rehabilitation potential was good.  (Tr. 1043).

On April 9, 2020, Kopis saw Osama Malak, M.D., for pain management.  (Tr. 1086).  She reported her history of back pain and prior surgical treatments, noting that she believed caring for her grandson could be aggravating her pain.  *Id.*  She indicated her pain was mainly

---

[2] Trendelenburg gait. (Visited 9/15/23)

located on the right side of her lower back, right buttock area, and radiated to her right groin and to the right front of her thigh. *Id.* She described the pain as severe sharp, shooting, stabbing, and aching, and noted it was aggravated with walking, standing, sweeping, and vacuuming, but was better with rest or a hot shower. *Id.* A chiropractor provided no relief. *Id.* Kopis also reported constant, moderately severe inflexibility, restricted movement, stiffness, and numbness, as well as burning, sharp, and stabbing pain radiating to her right popliteal region, thigh, hip, and kneecap. *Id.* She rated the pain as an 8/10. *Id.* Dr. Malak's physical examination revealed that Kopis had moderate to severe tenderness at her right sacroiliac joint and the right piriformis muscle, and she had a positive Patrick's test on her right side. (Tr. 1088). Dr. Malak start Kopis on Diclofenac and with physical therapy and continued her Flexeril. *Id.*

On April 10, 15, 17, 22, 23, and 29, 2020, Kopis had physical therapy, rating her pain as 8/10. (Tr. 1048, 1051, 1054, 1058, 1062, 1066). Kopis's complaints and Renner's observations on objective examination were largely the same as from her prior session, but notably in her April 23 session, she reported that her pain was "bad again." (Tr. 1048-1049, 1051-1052, 1054-1055, 1058-1059, 1062-1063, 1066-1067). After several sessions, Kopis reported having some temporary pain relief. (Tr. 1053, 1056, 1060, 1064, 1068). Occasionally, she noted continued leg pain or a fear her leg would give out. (Tr. 1060, 1064, 1068).

On April 28, 2020, Kopis saw Dr. Berkowitz, for her hip pain and x-rays of her hip. (Tr. 1125). Kopis noted her pain was increasing and estimated that 90% of her problem was groin pain, thigh pain, and lateral hip, all on the right. (Tr. 1126). Kopis also reported that she could not put on her socks and shoes, or get in and out of a car, due to the pain. (Tr. 1127). Dr. Berkowitz noted that on physical examination, Kopis had no pain on her left side, but moderate to severe pain with internal and external rotation on her right. (Tr. 1126). He noted

7

that Kopis was also very tender to palpation over the left greater trochanteric region, which suggested bursitis, and walked with a pronounced right limp.  *Id.*  Dr. Berkowitz reported that x-rays showed moderate osteoarthritis in both hips.  (Tr. 1126-1127; *see also* Tr. 1139).  Dr. Berkowitz and Kopis discussed the risks of a cortisone injection, and she was provided with one in the right bursa of her hip.  (Tr. 1126-1127).

On May 1 and 6, 2020, Kopis had additional physical therapy sessions.  (Tr. 1070, 1073). Her subjective complaints and the therapists' observations on examination remained largely unchanged.  (Tr. 1070-1071, 1073-1074).  Following her May 6 session, Kopis was given at-home exercises and discharged from therapy with a "fair" prognosis.  (Tr. 1075).  It was noted that Kopis chose to discontinued therapy.  (Tr. 1076).

On May 5, 2020, Kopis saw Dr. Berkowitz, for a follow-up appointment after her injection.  (Tr. 1123).  Kopis reported that the injection helped "a little" for 2 or 3 days, reducing her pain by about 50%.  (Tr. 1123-1124).  She said she still had pain in her groin, anterior thigh, a little of her lateral thigh, but not below her knee.  (Tr. 1124).  Activity aggravated her pain, while rest made it better.  *Id.*  Dr. Berkowitz ordered her to undergo an intraarticular x-ray assisted with an injection with an arthrogram into her right hip.  *Id.*  He indicated that, as best as he could tell, her pain was a hip issue.  *Id.*

On May 7, 2020, Kopis saw Dr. Malak.  (Tr. 1089).  She reported that there was no change in her degree of lower back pain and continued to describe the same severity and sensations as before.  *Id.*  She added that she had been feeling constant severe right leg pain and rated her lower back pain as 8/10 and her right leg pain as 9/10.  *Id.*  Based on Kopis's reports that the physical therapy and Diclofenac had not helped, Dr. Malak started her on Gabapentin and planned to schedule her for a "TFESI [transforaminal epidural steroid injection] ASAP to

control her pain." (Tr. 1091).  On May 13, 2020, Kopis had the injection guided by fluoroscopic x-ray. (Tr. 1137-1138).

On May 29, 2020, Kopis saw William Stanfield, M.D., regarding her right hip osteoarthritis. (Tr. 1120).  Kopis reported having had an injection that provided minimal improvement and stated that she wanted to proceed with a right hip replacement due to the discomfort and difficulty moving she experienced. *Id.*  On examination, Dr. Stanfield observed that Kopis's right hip was tender to touch along the groin and lateral bursal area; the hip joint displayed occasional catching, locking, and mechanical symptoms; there was mild crepitus seen in the hip internally and "external range of skin," and her range of motion showed that flexion and rotation were limited with pain. *Id.*  He noted that Kopis could put weight on the hip, but had discomfort, and that her gait was antalgic. *Id.*  Dr. Stanfield assessed Kopis with right-sided hip pain due to osteoarthritis and scheduled her for a total right hip replacement. (Tr. 1121).

On July 6, 2020, Kopis saw Dr. Ravichandran, for pre-operative clearance for a right hip replacement. (Tr. 1161-1164).  A review of her systems was unremarkable. (Tr. 1161).  On examination, Dr. Ravichandran observed that Kopis had 5/5 motor strength in her extremities and grossly intact sensations. *Id.*  She encouraged Kopis to quit smoking, lose weight, and ordered chest x-rays, which were unremarkable. (Tr. 1162, 1323).

On July 10, 2020, Kopis saw Dr. Ravichandran, regarding her history of coronary artery disease, hyperglycemia, hyperlipidemia, and hypothyroidism. (Tr. 1149-1152).  A review of her systems and physical examination results were unremarkable. (Tr. 1149).  Kopis was diagnosed with hyperglycemia, obesity, smoking, depression, and hematuria. (Tr. 1153).  Among other things, Dr. Ravichandran ordered ultrasounds. *Id.*

On July 14, 2020, Kopis saw Eric Gaines, PA-C, for a pre-operative appointment before her hip replacement.  (Tr. 1211).  Gaines noted that Kopis had pain in her hip that increased with activity and weight bearing, walked with an antalgic gait, and had a limited range of motion in her hip.  (Tr. 1211).  He noted she also had failed to respond to conservative treatment and, thus, they discussed her surgery.  *Id.*

On July 20, 2020, Kopis underwent a total right hip replacement surgery.  (Tr. 1345). X-rays taken after the procedure demonstrated satisfactory post-operative conditions.  (*See* Tr. 1225).  The following day, Kopis was noted as recovering well and was discharged. (Tr. 1350).  Her physical examination results were unremarkable.  (Tr. 1351).

On August 5, 2020, Kopis saw Dr. Stanfield.  (Tr. 1206).  She reported she was doing well, doing home physical therapy, and was happy with her pain relief, although she had some soreness from her incision.  *Id.*  On examination, Dr. Stanfield noted her incision was well-healed, and she had good range of motion in her hip, knee, and ankle.  *Id.*  X-rays of her hip indicated that her hip replacement was in good alignment, and there were no signs of any bony abnormality.  (Tr. 1207; *see also* Tr. 1224).  Dr. Stanfield prescribed physical therapy and instructed Kopis to wean herself off of her walker to a cane.  (Tr. 1206).

On August 12, 2020, Kopis had an initial physical therapy evaluation.  (Tr. 2032).  Kopis reported that she had stopped using her walker, and she experienced the most pain at night and was not sleeping well.  (Tr. 2034).  Regarding daily activities, she reported difficulty putting on or taking off her pants and putting on shoes, having four or more sleep disturbances at night, and that she was unable to stand or walk for more than 10 minutes.  *Id.*  On physical examination, Kopis showed greater limitation to her range of motion and muscle movements in her left hip

than on her right.  (Tr. 2032).  The plan was for Kopis to attend therapy two to three times a week for twelve weeks.  (Tr. 2035).

On August 14, 17, 19, 21, and 24, 2020, Kopis had physical therapy, and rated her pain as 2/10.  (Tr. 2039, 2042, 2045, 2048, 2051).  Her physical examination findings remained unchanged from her initial evaluation.  (Tr. 2039-2040, 2042-2043, 2045-2046, 2048-2049, 2051-2052).  Throughout her sessions, Kopis was generally noted to be progressing, despite sporadic sessions when she reported increased pain.  (*See* Tr. 2041, 2044, 2047, 2050, 2053).

On August 24, 2020, Kopis saw Dr. Ravichandran for a follow-up regarding her left hip pain.  (Tr. 1265).  A review of her systems was unremarkable, as were her physical examination results.  *Id.*  Dr. Ravichandran noted Kopis's blood work was fine and ordered her to undergo a kidney and bladder ultrasound.  *Id.*

On August 26, 28, and 31, and September 2, 4, 11, 2020, Kopis had additional therapy.  (Tr. 2054, 2057, 2060, 2063, 2066, 2070).  Her complaints and physical examination results remained unchanged.  (Tr. 2054-2055, 2057-2058, 2060-2061, 2063-2064, 2066-2067, 2070-2071).  Throughout her sessions, Kopis's complaints of pain had diminished, and, on September 11, she was discharged with an "excellent" prognosis.  (*See* Tr. 2056, 2059, 2062, 2065, 2068, 2072-2073).

On October 6, 2020, Kopis saw Dr. Ravichandran for pre-operative clearance for a left hip replacement.  (Tr. 1258).  A review of her systems was unremarkable, as were her physical examination results.  *Id.*  Dr. Ravichandran cleared her for surgery.  *Id.*

On October 19, 2020, Kopis underwent a left hip total arthroplasty and was noted to have tolerated the procedure well.  (Tr. 1363-1366).  The following day, Kopis's physical examination results were unremarkable, and she was discharged.  (Tr. 1370, 1376-1377).

On October 22, 2020, Kopis returned to physical therapy after being identified as a fall risk and after having progressively worse left hip pain over the preceding year.  (Tr. 2076).  Kopis indicated that her hip pain was 5/10; at best it was 4/10, and at worst it was a 7/10.  *Id.*  She reported needing assistance with dressing, home maintenance, managing her medication, toileting, and transitional activities, and being totally unable to drive/travel.  *Id.*  She also had nightly sleep disturbances and was able to stand or walk for less than 10 minutes.  *Id.*  On examination, it was noted that she had moderate left hip swelling, used a straight cane, had decreased walking cadence and stride length, and had overall reduced abduction, flexion, and extension in her leg.  (Tr. 2077).

On October 23, 2020, Kopis returned for physical therapy.  (Tr. 2085).  The therapist noted that Kopis could not flex her left hip when she sat and had muscle weakness and high pain levels.  (Tr. 2087).  Kopis expressed concerns about walking on stairs and was instructed to discontinue attempting steps.  *Id.*

On October 26, 2020, Kopis had physical therapy and reported that she had been to an ER because of a UTI, and her current UTI pain was 9/10.  (Tr. 2089).  Kopis also noted that her left hip pain was 7/10 and she was frustrated with her pain and UTI situation.  *Id.*  Kopis also indicated she had become lightheaded the day before and had fallen.  *Id.*  The therapist noted that Kopis's left hip was swollen and that Kopis declined to do standing exercises because of increased pain and for fear of soiling herself.  (Tr. 2092).

On October 28, 2020, Kopis returned for therapy.  (Tr. 2093).  The therapist noted Kopis was tearful, reported 8/10 pain, and felt weak.  *Id.*  The therapist also noted that Kopis was fatigued and in pain from her UTI.  (Tr. 2096).

12

On October 29, 2020, Kopis saw Michael Zell, M.D., and was assessed with urinary incontinence, gross hematuria, smoking, and dysuria following her hip replacement. (Tr. 1563-1564).  Dr. Zell's observations on physical examination were unremarkable.  (Tr. 1566-1567).  Dr. Zell recommended that Kopis undergo a CT urogram, cystoscopy, cytology, and a urine analysis for her gross hematuria, and that they test her for a UTI.  (Tr. 1564).

On November 19, 2020, Kopis saw Dr. Zell, reporting her UTI had resolved but she had persistent urinary frequency.  (Tr. 1568).  Dr. Zell indicated her other procedures were unrevealing and that frequency could be a residual symptom of her UTI and could resolve in a few weeks.  (Tr. 1568, *see* Tr. 1572-1578)*.* While there, Kopis underwent a cystoscopy, the results of which were unremarkable.  (Tr. 1571).

On November 23, 2020, Kopis saw Dr. Ravichandran for a follow-up after her total left hip replacement.  (Tr. 1254).  A review of her systems was unremarkable, as were her results from recent blood work.  *Id.*  She was to follow-up in six months.  *Id.*

On November 23, 25, and December 1, 3, and 8, 2020, Kopis had physical therapy for her left hip.  (Tr. 2098, 2107, 2110, 2113, 2116).  During her session, Kopis was noted to be improved, although sleep disruption from pain was a persistent issue.  (Tr. 2109, 2112, 2115).  Kopis's last session, however, was shortened due to increased pain and a lump on her surgical hip.  (Tr. 2118).

On December 8, 2020, Kopis had both hips x-rayed, which indicated her total left hip replacement was in good alignment with no signs of bony abnormalities.  (Tr. 1322).

On December 10, 15, 17, and 29, 2020, and January 5, 7, 12, 14, and 19, 2021 Kopis had physical therapy and was noted to have responded well and have good tolerance, despite persistent pain in her hip and/or leg.  (Tr. 2119-2137, 2141-2152).

On January 21, 2021, Kopis saw Dr. Ravichandran, complaining of epigastric pain and nausea for the preceding week.  (Tr. 1650).  On examination, Dr. Ravichandran noted that Kopis had slight tenderness in the epigastric area but no tenderness in her upper quadrant.  *Id.*  She assessed Kopis with likely gastritis or H. pylori, prescribed her medication, and referred her to gastroenterology.  *Id.*

On January 26 and February 1, 2021, Kopis had physical therapy and reported less pain in her calf and hip; the therapist noted that Kopis's gait was normalizing, and she needed fewer cues for correction.  (Tr. 2154-2159).  Kopis was discharged after the February 1 session with a good prognosis.  (Tr. 2159).

On February 2, 2021, Kopis underwent an MRI of her spine, which indicated that the appearance of her lumbar spine had not significantly changed since her March 2020 MRI.  (Tr. 1320-1321).

On February 9, 2021, Kopis saw Dr. Berkowitz, regarding her back pain.  (Tr. 1482). She reported that she had mainly left shin and lateral more than proximal leg pain, but she did have some proximal symptoms and some numbness in her toes and left foot.  *Id.*  On examination, Dr. Berkowitz observed that Kopis had no tenderness, good range of motion, and a slight decrease of pain.  (Tr. 1484).  But Kopis had pain at extremes, her hips had a slight decreased range of motion but good strength; her knees and ankles were unremarkable, and her gait was normal.  *Id.*  Based on an MRI, which showed lateral recess stenosis at L4-5, he believed the stenosis was causing compression of the L5 nerve root.  (Tr. 1484, *see also* 1732-1734).  He referred her to pain management for an interlaminar injection.  (Tr. 1484).

On February 18, 2021, Kopis saw Dr. Malak for pain management.  (Tr. 1497).  Kopis reported that she had a "definite reduction in [the] severity" of her lower back pain, and resting

14

made it better, but her pain was aggravated by sitting, standing, walking, and carrying.  *Id.*  She also noted left leg pain, which she described as constant, moderate, achy, throbbing, stabbing, and shooting pain.  *Id.*  She rated her lower back and left leg pain as 7/10.  *Id.*  On examination, Dr. Malak observed normal range of motion in Kopis's shoulders and elbows, without any tenderness, but she had painful rotation and flexion in her back, facet tenderness in her back, and sacroiliac joint tenderness bilaterally.  (Tr. 1498-1499).  He noted that she had a positive Patrick's test on both sides.  (Tr. 1499).  He diagnosed Kopis with post-laminectomy syndrome, other spondylosis with radiculopathy, other intervertebral disc degeneration, other intervertebral disc displacement, intervertebral disc disorders with radiculopathy, and sacroiliitis.  *Id.*  Dr. Malak recommended injections.  (Tr. 1500).

On February 25, March 5, and March 18, 2021, Kopis saw Dr. Ravichandran.  (Tr. 1640, 1643, 1646).  Initially, Kopis reported that she believed her depression was no longer being controlled by Celexa, and Dr. Ravichandran started Kopis on Wellbutrin.  (Tr. 1646).  Subsequently, however, Kopis reported feeling sick from Wellbutrin, and Dr. Ravichandran restarted her Celexa.  (Tr. 1643).  At her visit on March 18, a review of Kopis's systems was unremarkable, as was her physical examination.  (Tr. 1640).  Dr. Ravichandran noted her depression was stable on Celexa, and she had trouble sleeping, snoring, experienced long-term pain, and experienced symptoms of depression.  (Tr. 1641).

On March 31, 2021, Kopis received a lumbar epidural steroid injection, which she tolerated well.  (Tr. 1663-1664).

On April 6, 2021, Kopis saw Dr. Stanfield, for a follow-up after her total right hip replacement.  (Tr. 1585-1586).  She reported that her left hip was going well, she had right thigh pain, and injections for her back pain helped her left leg pain.  (Tr. 1586).  Her physical

examination results were unremarkable.  *Id.*  Dr. Stanfield indicated that he thought her right thigh pain was a combination of overstressing the hip joint, given her left side symptoms, and soreness at the tip of the stem.  *Id.*  He recommended continuing treatment, and x-rays if her pain increased.  *Id.*  Subsequent X-rays of her hips were unremarkable.  (Tr. 1601-1602).

On April 19, 2021, Kopis received a sacroiliac joint injection with fluoroscopy, which she was noted as tolerating well.  (Tr. 1665-1666).

On April 20, 2021, Kopis saw Dr. Berkowitz.  (Tr. 1596).  She reported that she had one injection that had not helped her, but she returned the day prior and received injections on both sides of her spine, which helped her pain and numbness a little bit, reducing her left-side pain 60 to 70%.  (Tr. 1596, 1598).  On examination, Dr. Berkowitz observed that Kopis had a normal gait, tenderness in her paraspinal musculature throughout her lumbar spine with decreased range of motion, and full range of motion her in lower extremities.  (Tr. 1598).  His assessment was that Kopis's left-side pain came from her back, while her right-side pain came from her hip, and he recommended that she continue pain management and maybe use a spinal cord stimulator.  *Id.*

On April 28, 2021, Kopis saw Dr. Coates.  (Tr. 1525).  A review of her systems indicated she had sinus issues, smoked, stomach ulcers, and arthritis.  *Id.*  She reported that she slept on her side, but did not sleep well, continued her hobbies as before, and indicated she had problems with recurring headaches, pain disrupting her sleep, and a smoker's cough.  (Tr. 1526).  On examination, Dr. Coates graded Kopis's range of motion in her cervical spine as 4 to 5/10 and her thoracolumbar spine as 6/10.  (Tr. 1528).  He rated her pain as Grade 2 (of 4) upon cervical spine flexion, extension, and right rotation, and also Grade 2 across her thoracolumbar spine. (Tr. 1528).  Her cervical spine pain was dull, while her thoracolumbar spine pain was sharp.  *Id.*

Dr. Coates discussed treatment options with Kopis, who was open to manipulative therapy.  (Tr. 1531).

On April 30, and May 4, 7, 11, and 14, 2021, Kopis saw Dr. Coates, who reported that Kopis was improving and, except for her May 7 appointment when he noted mild exacerbation of her condition, her lower extremity irritation and/or range of motion limitations were improving.  (Tr. 1531-1532).

On May 14, 2021, Kopis saw her pain management doctor, regarding her back and leg pain.  (Tr. 1656).  Kopis reported feeling "some degree" of improvement in the severity of her lower back pain, and described having constant moderately severe inflexibility, restricted movement, stiffness, and numbness sensations, as well as burning, sharp, and stabbing pain radiating to the right popliteal region and in both thighs.  *Id.*  Kopis rated her back pain as 7/10 and her leg pain as 7/10.  *Id.*  On examination, the doctor observed that Kopis had limited extension, rotation, and flexion in her head and neck.  (Tr. 1657).  She also observed that her range of motion in her shoulders and elbows was within normal limits, but she had pain with lateral flexion, rotation, and facet tenderness in her spine and sacroiliac joints.  *Id.*  The doctor noted a Patrick's test was positive on both sides and sensation in her left leg was decreased.  *Id.* It was recommended that Kopis receive additional injections and start Gabapentin.  (Tr. 1658).

On May 28, 2021, Kopis saw Dr. Coates, who noted she had continued steady progress, her lower extremity irritation had markedly diminished, and she walked with a better gait and posture.  (Tr. 1532).  He continued to have her work on at-home exercises.  *Id.*

On June 10, 2021, Kopis saw her pain management specialists.  (Tr. 1659-1662).  Kopis reported that her lower back pain was increasing in its severity, describing it largely as the same as her prior appointment.  (Tr. 1659).  She described her left leg pain as constant, moderate,

achy, throbbing, stabbing, and shooting.  *Id.*  Kopis rated her back pain as 8/10 and her right leg

pain as 7/10.  *Id.*  A review of her systems was consistent with her complaints.  (Tr. 1660).  And

her physical examination results were unremarkable.  (Tr. 1660-1661).  Injections were

recommended to help alleviated Kopis's pain and her medication was adjusted.  (Tr. 1662).

On June 11, 2021, Kopis saw Dr. Berkowitz about her hip and back pain.  (Tr. 1592).

Kopis reported having injections into her back that took away her left leg pain but had persistent

right thigh pain.  (Tr. 1593).  She indicated that she still had a lot of back, buttock, and hamstring

pain, and that she could not walk any distance without having to stop, sit, and lean forward.  *Id.*

On examination, Dr. Berkowitz observed that Kopis's back was tender in the paraspinous

musculature, and she had a slight decrease in her range of motion; he also observed that she had

full range of motion without crepitus, instability, or exacerbation of pain in her hips, knees, and

ankles.  (Tr. 1594).  While with Dr. Berkowitz, Kopis underwent x-rays of her spine that showed

mild spondylolisthesis at two discs.  (Tr. 1595, *see also* Tr. 1612).  Dr. Berkowitz's assessment

was that Kopis likely had stem pain related to her right hip replacement and pain from stenosis

across various points of her spine.  (Tr. 1592).  He discussed her treatment options and, based on

her prior treatment, Kopis wanted to proceed with surgery.  *Id.*  Dr. Berkowitz indicated that he

believed a midline laminectomy would best address her stenosis symptoms.  *Id.*

On June 21, 2021, Kopis saw Dr. Ravichandran for epigastric pain and nausea she had

been experiencing for the past week.  (Tr. 1249).  On examination, Dr. Ravichandran noted that

her liver and spleen were not palpable, and she had slight tenderness in the epigastric area, but

her results were otherwise unremarkable.  *Id.*  Dr. Ravichandran assessed Kopis with either

gastritis or H. pylori, prescribed her nausea medication, and referred Kopis to gastroenterology

for a possible endoscopy.  *Id.*  Regarding Kopis's other continuing conditions, Dr. Ravichandran

noted she was stable on her medications and advised her to continue the various lifestyle changes.  *Id.*

On June 25, 2021, Kopis saw Dr. Coates, who noted Kopis had agitation in the dorsal, lumbar, and sacroiliac regions of her spine.  (Tr. 1532).  He also noted point tenderness throughout more discs and encouraged Kopis her to continue her exercises.  *Id.*

On June 29, 2021, Kopis saw Dr. Ravichandran for preoperative clearance for a laminectomy.  (Tr. 1636).  A review of her systems and physical examination results were unremarkable, and Dr. Ravichandran cleared her for surgery.  *Id.*

On July 6, 2021, Kopis again saw Dr. Ravichandran regarding clearance for an upcoming hip replacement.  (Tr. 1275).  A review of her systems and her results on physical examination were unremarkable.  *Id.*  Kopis also underwent and EKG which was unremarkable.  *Id.* Dr. Ravichandran cleared her for surgery.  *Id.*

On July 6, 2021, Kopis also saw Dr. Stanfield, regarding her hip pain.  (Tr. 1581).  Kopis reported that she was doing great and did not have any symptoms, but she had right side thigh pain, burning, and shooting pain down to her leg.  *Id.*  She indicated she was scheduled to have surgery, but there was confusion of whether her pain was from her hip or back.  *Id.*  Her physical examination results were unremarkable.  (Tr. 1581-1582).  Kopis also underwent x-rays which were unremarkable.  (Tr. 1584, *see also* Tr. 1600).  Dr. Stanfield recommended doing a bone scan to make sure there was no evidence of any loosening or microscopic changes in her right hip.  (Tr. 1582).

On July 13, 2021, Kopis saw Dearth, regarding her lower back pain and for a preoperative discussion of the midline laminectomy she was to undergo.  (Tr. 1589).  On examination, Dearth's observations were unremarkable, noting Kopis had a cough, normal gait,

and tenderness in the paraspinal musculature throughout her lumbar spine with a decreased range of motion throughout.  (Tr. 1591).  Dearth assessed that Kopis was ready for the surgery but had a sinus infection that she would seek treatment for with her family doctor.  *Id.*

On July 20, 2021, Kopis saw Dr. Ravichandran for pre-operative clearance for her laminectomy.  (Tr. 1632).  She reported having an upper respiratory infection and receiving medication.  *Id.*  A review of her systems was unremarkable, except for noted coughing, congestion, wheezing, and shortness of breath.  *Id.*  Dr. Ravichandran observed that Kopis had diminished breath sounds and bilateral wheezing.  *Id.*  She prescribed an albuterol inhaler, a Medrol Dosepak, and ordered a chest x-ray, which was unremarkable.  (Tr. 1632, 1719).

On July 23, 2021, Kopis saw Dr. Ravichandran for a follow-up regarding bronchitis.  (Tr. 1627).  Kopis reported that she postponed her back surgery and was feeling better, but still took antibiotics.  *Id.*  A review of her systems was unremarkable, as was her physical examination.  *Id.*  Dr. Ravichandran noted Kopis's bronchitis had resolved.  *Id.*

On August 10, 2021, Kopis had a bone scan, which did not reveal the etiology of her pain, and she had arthritic changes in her axial and appendicular skeleton.  (Tr. 1758-1759).

On August 17, 2021, Kopis saw Dr. Stanfield.  (Tr. 1750).  Kopis reported continued mild thigh pain, mostly on her right side, particularly when she moved from sitting to standing.  *Id.*  She noted that the pain was alleviated with standing or twisting and that weightbearing caused a little soreness.  *Id.*  She also had intermittent numbness and tingling in both legs, noting her left leg pain seemed to have resolved.  *Id.*  On examination, Kopis's right leg had good range of motion, minimal pain with rotation, and tenderness with palpation along the bursal region.  *Id.*  Dr. Stanfield noted that the bone scan was inconclusive.  *Id.*

20

On August 30, 2021, Kopis saw Dr. Ravichandran for pre-spinal surgery clearance. (Tr. 2024).  A review of her systems was unremarkable, as were her physical examination results.  (Tr. 2024-2025).  And Dr. Ravichandran approved her for surgery.  (Tr. 2028).

On September 15, 2021, Kopis underwent spinal surgery for her stenosis. (Tr. 1765-1766).  She was discharged the following day in stable condition.  (Tr. 1898).

### C.     Relevant Opinion Evidence

#### 1.     Psychological Evaluation – Thomas M. Evans, Ph.D.

On November 4, 2020, Kopis underwent a psychological evaluation with Thomas M. Evans, Ph.D.  (Tr. 1237).  She described her personal, educational, medical, and work history. (Tr. 1237-1238).  She indicated that she had a driver's license, lived with her stepmother, and that they shared in the cooking and cleaning.  (Tr. 1238).  Dr. Evans observed that Kopis was dressed appropriately, adequately groomed, cooperative; used a walker; and was mildly uncomfortable in her seat, constantly shifting her weight.  (Tr. 1239).  He also observed that Kopis had normal speech, no loose or tangential thoughts, a euthymic mood and consistent affect.  *Id.*  She reported beginning to experience depression symptoms about 10 years earlier, indicated she had two to three good days a week, and rated her typical day as a 7/10 in terms of her depression's severity.  *Id.*  She indicated she had a depressed mood, fatigue, lack of motivation, frequent irritability, and crying episodes as symptoms.  *Id.*  About the same time as her depression, Kopis also reported experiencing anxiety symptoms, including increased heart rate, becoming hot/sweaty, restlessness and feeling jittery; she indicated she felt anxious on a daily basis.  *Id.*  Dr. Evans observed that Kopis was fully oriented and had adequate insight and judgment.  *Id.*  He assessed Kopis with Unspecified Depressive Disorder and Unspecified

Anxiety Disorder.  (Tr. 1240).  Dr. Evans conducted a functional assessment and found that Kopis's conditions would not impose any limitations.  *Id.*

### 2.    State Agency Consultants

On August 19, 2020, Uma Gupta, M.D., reviewed the record evidence of Kopis's RFC. (Tr. 773-775).  Dr. Gupta concluded that Kopis could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, was further limited in her ability to push and/or pull with her lower extremities, could stand and/or walk for 6 hours in an 8-hour workday, and could sit for a total of 6 hours in an 8-hour workday.  (Tr. 773).  Dr. Gupta also found that Kopis could: never climb ladders, ropes, or scaffolds; frequently balance; and occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl.  (Tr. 774).  Dr. Gupta concluded that Kopis should avoid all exposure to hazards, but did not have any manipulative, visual, communicative, or other environmental limitations.  *Id.*  On March 27, 2021, Linda Hall, M.D., reconsidered the records evidence of Kopis's RFC; she affirmed Dr. Gupta's conclusions.  (Tr. 791-793).

### D.    Relevant Testimonial Evidence

Kopis testified at the administrative hearing.  (Tr. 738-757).  Kopis stated that she lived with her parents and her two-year-old grandson.  (Tr. 738).  She had a driver's licenses and a high school diploma.  (Tr. 738-739).  She also smoked about 10 cigarettes a day.  (Tr. 739).  She would occasionally prepare meals, wash the dishes, and do laundry, except for carrying the basket.  *Id.*  She would sit a lot while she did chores or a task, like cooking a meal.  (Tr. 754). She would sometimes go shopping, either using a cart or a wheelchair cart.  (Tr. 739-740).  She did not have any difficulty with her personal care.  (Tr. 740).  She described her average day as getting up and getting her grandson up, with her father lifting the child from his crib, and then dressing and feeding him, them napping, and then making dinner.  *Id.*  She did not really run

errands during the day, but she did feed and water her dog.  (Tr. 740-741).  She used her phone to talk and text, and used a computer, laptop, or tablet to look things up.  (Tr. 741).

Kopis testified that she last worked in May 2018 for Dial America and had previously worked as a food steward for Speedway, a call center worker, at the deli and meat sections of a grocery store, and as a manager at a car emissions testing site.  (Tr. 741-745).

Kopis believed she could no longer work because she had a lot of pain from her hip replacements and two back surgeries.  *Id.*  She estimated that she could not walk or stand for longer than five minutes.  *Id.*  She would switch between sitting and standing most of the day, moving once her feet went numb or her back hurt.  *Id.*  Her father helped her care for her grandson.  (Tr. 745-746).  Her surgeries provided a little relief in her hips, but it was too soon to tell about her back.  (Tr. 746).  Her latest surgery was a fusion in her back, and before that she had injections that did not provide any relief.  (Tr. 747).  Although Kopis was not in mental health counseling, she was taking medication for anxiety because a couple of times a week, she would get antsy, frustrated, angry, and cry.  (Tr. 749).  She did not think the medication helped.  (Tr. 755).  She did not think she could lift over 10 pounds or a gallon of milk.  (Tr. 749).  She also used a cane when walking and going up stairs.  (Tr. 749-750).  She did not have any trouble holding objects or reaching for things in front of her, but she struggled to reach overhead because she could not move her head to look up; and all of those movements caused pain.  (Tr. 750, 753-754).  She could not get down on both knees or crawl.  (Tr. 750).  Without the cane, Kopis did not think she could stand for five minutes.  (Tr. 752).  She could sit for about 5 to 10 minutes before her feet went numb.  *Id.*  Because lying down provided pain relief, Kopis estimated she laid down for a couple of hours a day.  *Id.*  Her daughter would also come over and help two to three days a week.  (Tr. 755).

23

### III.      Law & Analysis

#### A.      Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to deciding "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009).  Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion, *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  However, the ALJ's decision will not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant. *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009).  Nor will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

#### B.      Step Four: Subjective Symptom Complaints

Kopis contends the ALJ erred in the evaluation of her subjective symptom complaints of pain.  ECF Doc. 10 at 11-12.  Kopis argues that the ALJ provided only a boilerplate explanation for the inconsistencies she allegedly found between Kopis's complaints and the record evidence and improperly relied heavily on evidence from before her alleged onset date.  ECF Doc. 10 at 12-16.  Moreover, she argues that the ALJ erred in rejecting the state agency consultants' opinions and in failing to obtain additional examinations.  ECF Doc. 10 at 16-19.  The Commissioner disagrees.  ECF Doc. 13 at 8-15.  In her reply brief, Kopis reiterates her arguments. *See* ECF Doc. 14.

A claimant's subjective symptom complaints are among the evidence that an ALJ must consider in assessing a claimant's RFC at Step Four of the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability."). Generally, an ALJ must explain whether she finds the claimant's subjective complaints consistent with objective medical evidence and other evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017); *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain her reasons for discounting subjective complaints).  In conducting this analysis, the ALJ may consider several factors, including claimant's efforts to alleviate her symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).  The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

So long as the ALJ's RFC determination considered the entire record, the ALJ is permitted to decide which medical findings to credit and which to reject in determining the

claimant's RFC.  *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) (unpublished) ("The ALJ parsed the medical reports and made necessary decisions about which medical findings to credit, and which to reject.  Contrary to [the claimant's] contention, the ALJ had the authority to make these determinations.").  However, an ALJ improperly "cherry-picks" evidence when her decision does not recognize a conflict between the functional limitations described in a medical opinion and the ALJ's RFC finding and explain why he chose to credit one portion over another.  *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 U.S. Dist. LEXIS 68715, at *44 (N.D. Ohio 2018).

The ALJ applied the correct legal standards and reached a decision supported by substantial evidence in finding Kopis's subjective symptoms complaints inconsistent with the record evidence.  42 U.S.C. §§ 405(g), 1383(c)(3); *Blakley*, 581 F.3d at 405.  Kopis's challenge takes aim at the ALJ's articulation and explanation of her finding.  But in doing so, Kopis seems not to read and consider the entirety of the ALJ's decision with a commonsense viewpoint. *Buckhanon ex rel. J.H. v. Astrue*¸ 368 F. App'x 674, 678-79 (7th Cir. 2020) ("[The court] read[s] the ALJ's decision as a whole and with common sense.").  First, as to the evidence pre-dating Kopis's alleged onset, she is correct that the ALJ cited evidence from before the relevant period but did so explicitly to provide greater context for Kopis's conditions and the numerous *pages* of evidence from within the relevant time period that the ALJ also summarized.  (*See* Tr. 718-722). The ALJ also provided a detailed paragraph about how all of the objective evidence indicated that Kopis would have difficulty with specific activities and various postural limitations. (Tr. 722-723).  And the ALJ's discussion of the medical evidence did not indicate that she somehow relied on the pre-onset evidence to the exclusion of that from the relevant period.

It is from these paragraphs that Kopis then argues that the ALJ provided an arbitrary assessment of her limitations.  ECF Doc. 12 at 14.  But Kopis's contention focuses on a single sentence she pulled from the larger ALJ discussion.  (*See* Tr. 722).  In that paragraph, the ALJ explained that, in her weighing of the evidence, she found support for various conditions; she, in turn, found that this evidence supported the finding that Kopis would have difficulty with certain activities.  The ALJ then proceeded to identify various records in the medical evidence that undermined Kopis's allegations.  *Id.*  Specifically, the ALJ stated:

> Although the claimant has alleged greater functional limitations (Hearing Testimony), the record is absent sufficient objective evidence to support her allegations, as examinations have revealed normal upper extremity sensation and range of motion, full upper and lower extremity straight, stable joints, no calf swelling or tenderness, generally intact sensation, intact manipulative function, consistently negative straight leg raising, intact ability to weight bear and walk on heels and toes, and at times, a normal gait with independent ambulation.

(Tr. 722).  It is true that the ALJ did not provide a line-by-line rebuttal of Kopis's complaints.  But she was not required to.  Under the regulations, the ALJ needed to provide sufficient discussion of Kopis's complaints and summary of the medical evidence to demonstrated that she considered it and "build a logical bridge" between the evidence and her conclusions.  *See Fleischer*, 774 F. Supp.2d at 877.  The ALJ did this.

Further, contrary to Kopis's argument that the ALJ wrongly decided her claim by judging Kopis's complaints only against the objective evidence, the ALJ also found: (i) that Kopis's daily activities undermined her allegations, and (ii) that the record evidence concerning her musculoskeletal conditions indicated her symptoms were manageable.  (*See* Tr. 723).  The ALJ explicitly acknowledged her obligation to consider the regulatory factors in SSR 16-3p in her assessment of Kopis's complaints.  (*See* Tr. 717).  Kopis contends that this was insufficient, in part, because the ALJ did not explicitly discuss Kopis's absences from work due to surgeries,

recovery times, physical therapy, and doctors' visits.  *See* ECF Doc. 10 at 18.  This contention is flawed in two respects.  First, the ALJ was not required to explicitly discuss every factor or possible factor in evaluating Kopis's subjective complaints.  *See* SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  But even more to the point, Kopis has not pointed to evidence that she needed to attend appointments during the workday or that they would result in substantial time off.  *See Lang v. Comm'r of Soc. Sec.*, No. 17-14105, 2018 U.S. Dist. LEXIS 191037, at *16 (E.D. Mich. Sept. 14, 2018).  Nor does Kopis's past need for surgeries and resultant recovery times constitute evidence of future functional limitations or time away from work to such a degree that a disability finding would be warranted.

Moreover, the ALJ's inconsistency finding is supported by substantial evidence.  Such evidence includes: (i) treatment notes indicating that Kopis's upper extremities had mild to no limitation, (*see* Tr. 1093, 1149, 1161, 1171, 1258, 1265, 1499, 1591, 1598, 1636, 1640, 1657); (ii) treatment notes indicating she had normal strength and sensation in her lower extremities (*see* Tr. 1088, 1120, 1149, 1161, 1171, 1258, 1265, 1484, 1499, 1591, 1594, 1598, 1636, 1640, 1657); (iii) the lack of treatment notes identifying any manipulative limitations or impairment; (iv) treatment notes after her hip surgeries indicating she had a normal gait, (*see* Tr. 1484, 1591, 1598); (v) treatment notes indicating Kopis improved with chiropractic treatment, physical therapy, and surgical or procedural interventions, (*see* Tr. 1031, 1053, 1056, 1060, 1064, 1068, 1123-1124, 1130, 1531-1532, 1586, 1596-1598, 2056, 2059, 2062, 2065, 2068, 2072-2073, 2087, 2154-2159); and (vi) Kopis's acknowledgement that she could do various chores, care for her grandson, care for her dog, and use a phone and computer (*see* Tr. 739-741).  *See Blakley*, 581 F.3d at 406.  Many of these findings showed what Kopis could do despite her pain.

Although Kopis made a passing argument that the ALJ "cherry-picked" the record, Kopis has acknowledged that her contention was not that the ALJ strategically picked the cited evidence, but that she did so without a sufficient explanation to permit Kopis to know that her complaints were properly considered.  *See* ECF Doc. 10 at 15.  However, for the reasons discussed above, I find that the ALJ provided an adequate explanation and summary of both Kopis's complaints, the medical evidence, and how she found the two inconsistent.

Lastly, Kopis has asserted that the ALJ's subjective symptom complaint finding was not supported because the ALJ's overall RFC findings were not based on specific medical opinions, and she claims the ALJ should have solicited such opinions.  ECF Doc. 10 at 15-16.  The ALJ's obligation to seek additional medical opinions arises in two circumstances: (i) when the ALJ makes an RFC determination based on *no* medical source opinion; or (ii) when the ALJ relies on an "outdated" medical source opinion "that does not include consideration of a critical body of objective medical evidence."  *See Kizys v. Comm'r*, No. 3:10-CV-25, 2011 U.S. Dist. LEXIS 122296, at *4 (N.D. Ohio Oct. 21, 2011).  Here, the ALJ relied on the state agency consultants and, thus, the only question is whether those consultants' opinions were "outdated."  *See Langford v. Comm'r*, No. 1:22-CV-00665, 2023 U.S. Dist. LEXIS 71275, at *73 (N.D. Ohio Apr. 24, 2023) (citing a state agency consultant's opinion in support of the contention that the ALJ reviewed timely medical source opinions).  Given that Dr. Hall reviewed the record evidence only 9 months before the ALJ issued her decision and 7 months before the administrative hearing, Hall's opinion is not rightly considered "outdated" because some gap between the opinion and the ALJ decision is always to be anticipated.  *See id.*  Plaintiff has pointed to no case law to the contrary.  Thus, the Court should reject this only slightly developed argument.

## IV.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Kopis's applications for DIB and SSI be affirmed.

Dated: September 26, 2023

Thomas M. Parker
United States Magistrate Judge

## Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, at *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

30